AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Western District of Arkansas

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

AUG 10 2022

JAMIE GIANI, Clerk
By _____ Deputy Clerk

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Apple iPhone 12 Pro Max
silver in color with a black case
IMEI 359871972136254

)
)
)  Case No. 5:22 CM 35
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ___Western___ District of ___Arkansas___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) | Controlled Substance Offenses |
| 21 USC 846 | Conspiracy |

The application is based on these facts:
See attached Affidavit of FBI TFO Brian Magee

- ☐ Continued on the attached sheet.
- ☑ Delayed notice of ____ days (give exact ending date if more than 30 days: __09/26/2022__) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

FBI TFO Brian Magee
*Printed name and title*

Sworn to before me and signed in my presence.

Date: August 10, 2022 @ 11:18am

City and state: Fayetteville, Arkansas

*Judge's signature*

Hon. Christy Comstock, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

One (1) iPhone 12 Pro Max, silver in color with a black case, IMEI:359871972136254, as depicted below.




## ATTACHMENT B

1. All records on the Device described in Attachment A that relate to violations of 21 U.S.C. § 841(a)(1) and 846, including but not limited to:

   a. Any and all communications to and from the Device involving the trafficking of controlled substances;

   B. Any and all electronic media, photographs, internet browser history, location history, or electronic application use indicative of violations of the above-referenced sections of the United States Code; and

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, communications, phonebooks, location history, saved usernames and passwords, documents, and browsing history.

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, **Brian Magee**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I have been a law enforcement officer in the State of Arkansas for approximately 16 years. I am presently assigned to the FBI as a Task Force Officer at the Fayetteville Resident Agency and am responsible for the investigation of a broad range of federal violations, to include narcotics trafficking in violation of Title 21 of the United States Code. I was previously assigned to the Washington County Patrol Division where I was responsible for investigating a large variety of crimes under the laws of the State of Arkansas. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and as such does not set forth all of my knowledge about this matter. This affidavit is being submitted for the limited purpose to establish probable cause for a search warrant for the search of an Apple iPhone 12 Pro Max, silver in color with a black case, IMEI 359871972136254, more particularly described in Attachment A, seized and maintained as evidence following a traffic stop of Daniel Phang Le on August 3, 2022 in the Western District of Arkansas.[1] For a more specific description of the cellular telephone, please refer to Attachment A.

---

[1] A criminal complaint for Le was issued on August 5, 2022 in WDAR case number 5:22 MJ 05025-001. The criminal complaint for Le issued in his case contains far less detail and background regarding the investigation into Le and the drug trafficking organization (DTO) for which Le is a member, as the overall DTO remains under active investigation in both the Northwest Arkansas and Dallas, Texas areas at this time. Revealing a more detailed account of the investigation to Le in his criminal complaint, and in turn, the public at large in the filed criminal complaint, would likely cause the remaining investigative targets, who are not in custody and are discussed in more detail below, to alter their criminal behavior, destroy evidence, or flee the jurisdiction(s), thus thwarting the investigation of the FBI, which remains ongoing. It is the intention of the United States Department of Justice to reveal this Affidavit and a more complete account of the investigation and Le's arrest after the presentation of Le's charges to a

2.  Based upon your Affiants knowledge, training, and experience, your Affiant knows that drug traffickers commonly use cellular phones to communicate with their criminal associates. These cell phones contain evidence regarding the dates and times of calls to and from their criminal associates as well as stored information regarding the telephone numbers, names, alias names and saved text messages (both sent and received) to and from their criminal associates. Cellular phones contain video and photographs of criminal associates, illegal substances, locations and other evidence pertinent to this investigation.

## PROBABLE CAUSE

3.  In approximately January 2021, an FBI confidential human source (CHS) started providing information about a drug trafficking organization (DTO) based in Dallas, Texas. Since that time, the CHS has continued providing information regarding the DTO. Handling Agents and task force officers have repeatedly corroborated the CHS' reporting via independent reporting by other sources, recorded telephone calls, and surveillance conducted during controlled narcotics purchases and meetings. CHS is receiving financial compensation in the form of cash payments as consideration for their efforts. I believe based upon these qualifications that CHS is a reliable informant whose information can be trusted as true and accurate.

4.  In January 2021, CHS conducted a controlled purchase of ½ kilogram of powder cocaine from targets Stephen Boyles and Pedro Mendez. Using the CHS, subsequent controlled purchases of ½-kilogram quantities of powder cocaine were undertaken from Boyles and Mendez in February 2021 and July 2021. It is noted that the July 2021 controlled purchase

---

Grand Jury sitting in this district, which is currently scheduled to occur on September 20-21, 2022. This disclosure will occur in the normal course of discovery after Le's arraignment, provided the Grand Jury returns a true bill indictment against Le.

also included Mendez selling the CHS two firearms, one of which was an illegal short-barreled assault rifle. In addition, the CHS conducted a controlled purchase of ¼-pound of powder cocaine from Mendez in April 2021, a controlled purchase of 2.57 ounces of powder cocaine in August 2021, and a controlled purchase of 2.53 ounces of powder cocaine in June 2022. In April 2021, Boyles and Mendez agreed to launder drug proceeds for the CHS. Pursuant to that agreement, under the direction of FBI Agents and task force officers, the CHS provided Boyles and Mendez $30,000 cash, which was represented to be proceeds from narcotics trafficking operations. Boyles and Mendez repeatedly told CHS they would ensure the funds were laundered and returned to the CHS. In August 2021, Mendez sent CHS a cashier's check drawn on a Wells Fargo business account in the amount of $5,000, and represented the payment to be the first installment in a series of payments representing the laundered funds.

4. In March 2022, Mendez introduced CHS to Brandon Garza in a personal meeting in Carrollton, Texas. Mendez told CHS that all the cocaine he supplied to CHS was obtained from Garza. During this meeting, Garza told CHS he could obtain any quantity of any drug CHS desired. Garza represented that he was receiving regular multi-kilo quantities of cocaine from his suppliers. Garza agreed to begin supplying CHS multi-kilogram quantities of high-quality powder cocaine. In a series of subsequent meetings in Dallas, Texas, the majority of which were recorded, Garza continued these discussions with the CHS, and eventually agreed to send a courier to Fayetteville, Arkansas on August 3, 2022, to deliver either five or ten kilograms of powder cocaine for a price of $26,000 per kilogram.

5. On August 2, 2022, the CHS and Garza participated in a consensually monitored FaceTime video call, wherein the CHS displayed $260,000 cash to Garza. During that call,

Garza advised the courier would depart Dallas, Texas the following morning, and arrive in Northwest Arkansas between 12:00 noon and 2:00 pm.

6. On the morning of August 3, 2022, the CHS and Garza spoke on multiple occasions. An FBI Special Agent was present for and heard these conversations. During the conversations, Garza provided the CHS updates regarding the courier's distance from Fayetteville. Garza advised that he obtained this information from the courier by contacting the courier while the courier was in route. The investigation had previously revealed through the CHS that the courier with the cocaine would likely be operating a silver Hyundai passenger car with Texas license tags.

7. At approximately 2:00 pm on August 3, 2022, a silver Hyundai passenger car fitting the description of the vehicle operated by Garza's courier was observed traveling north on I-49. Deputy Zachery Davis, a Benton County Sheriff's Office Deputy operating a marked patrol unit, observed the silver Hyundai cross the white line multiple lines in the far right lane. As the silver Hyundai approached Exit 81, Deputy Davis observed the silver Hyundai signal from the right lane to the middle lane. The vehicle failed to signal 100 feet before making the lane change. Deputy Davis got behind the silver Hyundai and initiated his emergency lights. The vehicle turned on its hazard lights and slowly moved to the right lane. The vehicle came to stop on I-49 just before the Pleasant Grove exit. Deputy Davis approached the vehicle on the driver's side. Deputy Davis identified himself and explained the reason for the stop. The male driver, later identified as Daniel Phang Le, stated he was hitting the line because of a truck that was next to him. Deputy Davis asked Le for his ID. Le said his was in his right pocket and Deputy Davis told the male he could grab it. When Le was trying to get his ID out of the wallet, Deputy Davis noticed his hand to be shaking a lot. Once Deputy Davis had the ID, he explained to Le that he

didn't like speaking with people in their vehicles and asked him to step out of the vehicle. Le asked if he could grab his vape, Deputy Davis told him that was fine. Le apologized and stated he was nervous.

8. Deputy Davis asked Le where he was coming from. Le stated he was coming from Garland, Texas. Deputy Davis told Le he was going to run his information and would be right back to talk to him. Deputy Davis asked Le if he had any weapons on him, he stated he did not. Deputy Davis asked Le he could pat him down and he said yes. Deputy Davis went back to his patrol vehicle and had dispatch run Daniel Pham Le through ACIC/NCIC. Dispatch advised Le had a valid driver's license and was clear of any warrants. Deputy Davis approached Daniel Pham Le again and asked where he was headed to. Le stated he was going to meet up with some buddies in Arkansas and they were going to take him camping. Deputy Davis asked Le where he was going to meet his buddies. Le said he was just going to meet his buddies at some hotel and just hang around the area. Deputy Davis asked where Le was going to go camping, he stated he didn't know. He explained to Le that he was working criminal interdiction on the highways. He asked Le if there were any weapons in the vehicle, Le maintained eye contact and said no. He asked if there were any large amounts of money, Le maintained eye contact and said no. He asked Daniel Pham Le if there was any meth, heroin, and cocaine in the vehicle. Daniel Pham Le maintained eye contact when asked about the meth and heroin, but looked down at the ground when asked about the cocaine. Deputy Davis asked Daniel Pham Le if he could search the vehicle. Daniel Pham Le looked at the vehicle and asked if he was allowed to decline. Le stated he didn't want to violate any of his rights. Deputy Davis explained to Daniel Pham Le it was completely his decision. Deputy Davis told him it was a yes or no question. Daniel Pham Le stated he did not want him to search.

9. Deputy Davis explained to him that he understood, but he had a K9 Deputy nearby and he was going to come to the traffic stop and conduct a free air sniff around the vehicle. Deputy Guthrie arrived on scene with his K9 partner Jager, while Deputy Davis was finishing explaining what was going to occur with the K9. Daniel Pham Le stated he was a little paranoid and asked how he would know if the Benton County Sheriff's Office just trained the dog to indicate on the vehicle. Deputy Davis explained to Daniel Pham Le that he was also a K9 handler and that the K9`s at Benton County are NNDDA (National Narcotic Detector Dog Association) and are national recognized narcotics detection dogs. Deputy Davis explained to Daniel Pham Le the K9 was going to conduct the free air sniff of the vehicle. Deputy Guthrie and K9 Jager conducted the free air sniff. Deputy Guthrie advised Deputy Davis that K9 Jager positively alerted on the vehicle. Deputy Davis asked Daniel Pham Le once again if there was anything inside the vehicle. Daniel Pham Le said he thought the K9 was going to smell his bottle of urine. Deputy Davis explained that the K9 wasn't worried about his bottle of urine. Deputy Davis told Daniel Pham Le the K9 positively alerted on the vehicle and he had probable cause to search the vehicle. As Deputy Davis turned around to go search the vehicle, he heard Daniel Pham Le say "Fuck".

10. Deputy Davis opened the driver door to the vehicle and observed a black duffle bag that had a green towel over it. He closed the driver door and opened the back passenger door. He opened the bag and observed one shirt and one pair of shorts. He moved the clothes and observed some brick shaped items inside. He knew from training and experience as a law enforcement officer that the bricks were kilos of some type of narcotics. Deputy Davis motioned to another Deputy at the scene to detain Daniel Pham Le. Deputy Davis photographed the bricks inside the vehicle and moved them to the hood of his patrol vehicle. He located 10 bricks inside the bag. Deputy Davis continued his search of the vehicle and located three other small baggies

that appeared to have a white powdery substance inside. He placed the baggies with white powder inside, in the side pocket of the duffel bag and seized the entire duffel bag as evidence.

11. Deputy Davis continued his search of the vehicle. He located no other illegal items inside the vehicle, but did locate the cellular telephone described in Attachment A on the passenger seat. He went to the patrol vehicle where Daniel Pham Le was detained. He asked Daniel Pham Le whose vehicle he was driving. Daniel Pham Le stated it was his girlfriend's vehicle. Deputy Davis read Daniel Pham Le his Miranda rights, Daniel Pham Le said he understood and would like to have a lawyer.

12. Deputy Davis later weighed the bricks found in the vehicle and it showed they weighed approximately 25 pounds. He tested one of the smaller baggies of white powder with a cocaine test kit, the test showed it to be positive for the presence of cocaine. The bricks, the small baggies, and the vehicle were packaged and processed into evidence at the Benton County Sheriff's Office.

13. As previously described, when Le was stopped by Benton County Sheriff's Office deputies on August 3, 2022, the cell phone described in Attachment A was located on the passenger seat of the vehicle and seized. As investigators were arresting Le, searching his vehicle and transporting the vehicle and seized cocaine to the Benton County Sheriff's Office, Le's phone rang repeatedly. In addition, during this same time period, the CHS was in telephonic contact with Garza. During those contacts, Garza advised he repeatedly attempted without success to contact Le, and sent CHS a screen shot reflecting his repeated efforts to call "Eric Le" on August 3, 2022 at 2:10 pm and 2:11 pm. Garza also sent the CHS a series of text messages stating, "His gf says his location is at a Walmart in Rodgers. How far is that? He ended up going solo" and "Man I think something happened. This is where his location is".

With that text message was a picture of Hank's Fine Furniture Store near Pleasant Crossing on Interstate 49 in Rogers, Arkansas. That Hank's Fine Furniture is located at 4308 S Pleasant Crossing Blvd, Rogers, AR, 72758, adjacent to a Walmart Supercenter. It is near the location on Interstate 49 where Benton County Sheriff's Office deputies stopped and arrested Le the same day.

14. Based upon my training, experience, and knowledge of this investigation, to include the controlled conversations between the CHS and Garza, I believe the cellular telephone described in Attachment A contains communications between Le and Garza, and other evidence, such as location evidence, which involves the transport of the seized cocaine. As such, I believe probable cause to search the cellular telephone described in Attachment A exists for the items described in Attachment B.

## TECHNICAL TERMS

15. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending,

receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS

9

navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet,

connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

16. Based on my training, experience, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and has internet capabilities. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

17. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

18. Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

19. Nature of examination: Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant. Manner of execution: Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

WHEREFORE, I believe that in light of the information contained herein, there is probable cause to believe that the device (more particularly described in Attachment A of this affidavit) seized by and in the possession of the FBI contains information and records which would constitute evidence of violations of 21 U.S.C. § 841(a)(1) and 846, and that there is probable cause for a search warrant authorizing the examination of the device described in Attachment A; for the items described in Attachment B. I further request that as a result of the information contained in Footnote 1, above, the Court allow a delay of notice pursuant to 18 U.S.C. § 3103a(b), as immediate notification of the existence of the contents of this search warrant may have an adverse result contemplated by 18 U.S.C. § 2705.

Respectfully submitted,

Brian P Magee
FBI Task Force Officer

Subscribed and sworn to before me on August __10__, 2022

HONORABLE CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE